## Colbert *versus* Caldwell.

1. To charge a person with the commission of an infamous offence, the *corpus* of which never existed, is actionable.

2. When an indictable offence is unequivocally imputed in the words used, the terms imputing the offence being *generic* and expressive of every ingredient to establish it, are *per se*, and without any reference to extrinsic matters, actionable.

3. When the words charging an infamous offence are qualified or explained at the time of speaking, so as to negative an indictable charge, which the court may perceive, and in view of which the judge would be bound to charge the jury were not actionable, he may properly, at *Nisi Prius*, award a non-suit under the act of assembly.

CERTIFICATE from NISI PRIUS.

[Colbert *v.* Caldwell.]

Action on the case for words spoken tending to injure plaintiff's credit and business.

The plaintiff, William Colbert, was largely engaged in the manufacture of bags and envelopes, and in the printing business, and up to the time of the alleged slander enjoyed a good mercantile standing. On the 15th August, 1855, he purchased on a credit of thirty days a bill of goods from the firm of Caldwell & English, of which defendant was a member, amounting to $1,075. On the 21st August, 1855, and before the maturity of the note to Caldwell & English, he had occasion to provide for the payment of a note of $703 to John Farnham & Co., and obtained the money from Moses Nathans, an auctioneer, as an advance on the goods before purchased of Caldwell & English, and placed them in his possession as security for the money advanced. The goods having appreciated in value, they were, on the 29th Aug., 1855, sent to Myers & Claghorn, auctioneers, by whom they were sold the next day at auction. About that time defendant called on Mr. Nathans and spoke the alleged slanderous words, which fully appear in the following testimony given on trial:—

Moses Nathans sworn.—I am an auctioneer, 2d above Spruce. I made plaintiff an advance of $700 on 14 bales muslin, to be sold at expiration of 30 days if not redeemed. Colbert called to see me a few days after, and I advised him to sell them prior to the 30 days; I sent them to Myers, Claghorn.& Co., and they were sold.

I received a note from Myers, Claghorn & Co. I called to see them; they told me the money was attached in their hands.

Mr. Caldwell called at my store; Mr. Colbert was there. I remarked I had just been speaking to Mr. Colbert about the attachment. Colbert said the money was not due, and that when it was due it would be paid; he said, I'll give you half cash now and a note for the balance.

I walked front with Mr. Caldwell. Caldwell then told me Colbert had purchased the goods under false pretences; that he purchased them for the purpose of making bags, and he (Caldwell) afterwards found them at Myers' auction store; that he would not have had them sent there in that way for the value of the bill; that he had behaved very badly. He said, "my ¾ goods were sold also." I asked him if they were paid for; he said they were. He then told me to let Colbert have no more money. I said there would be money from sales of other goods. He advised me to keep it and not give him any more. I told Caldwell when Colbert brought the goods I offered him $600; he said it would do him no good, and showed me a note of $700 he wanted to pay; that he wanted it to pay a note of John Farnum & Co., of over $700, and that

less would not do.   I offered him six hundred dollars; he said six hundred would do him no good.   The goods were in my hands for a few days.   It was an ordinary business transaction. When Colbert offered him half in gold and the balance in a note, Caldwell refused it; said he wanted his money.

Being *cross-examined,* witness says:   Caldwell says that they were bought to make bags of, and instead of that they were sent to auction.   They were left with me a few days prior to Aug. 20, 1855, the sale was to take place on the 30th August. The intention was to have them sold at auction; other lots were also sold that were got of Mr. Caldwell.   There was no limit; they were sold $\frac{1}{8}$ and $\frac{1}{4}$ per yard below cost.   Colbert could have had the money to pay Caldwell one-half; it was due him from me.   The other sales had not been accounted for.   He was boisterous and peremptory in his manner, and said he must have the money.

S. J. Megargee sworn.—I am of the firm of Megargee & Bro's. I am acquainted with plaintiff—he dealt with us—he had credit with us; don't recollect to what extent. It was withdrawn a year last spring.

We heard reports that were injurious.   We withdrew the credit from Mr. Colbert in consequence of hearing of some goods being sent to Myers & Claghorn's auction house, and being replevied.   We notified Mr. Colbert of it at the time, that being the reason.   The substance of what I heard was that he had bought goods for one purpose and sent them to auction for another.

John Muckloe sworn.—I was formerly in the employ of Colbert.   Have not been for some months.   He did an extensive business; kept some 50 or 60 girls at work, and several sewing machines.   Made in 1855 from ten to fifteen thousand bags per week.   I made the purchases for the house from March to after August.   Purchased on credit.   The first bill was purchased in June or July—a small lot on July 15th or 18th at 30 days. Second bill was bought August 15th; that was double the amount of the first bill.   After the transaction with Caldwell, couldn't do business on credit.   Immediately after the money was stopped he was protested, and then the business fell off. After that I could not obtain credit.   From doing a very large business, we had to give up the business.   The business declined almost altogether after these transactions.   The business declined from 20,000 bags per week to one hundred.   I was present at a conversation between Colbert and Caldwell.   Mr. Caldwell said, "Why did you send my goods to auction?"   I told him that if he was alarmed, if he would step round to the office it could be arranged.   Caldwell said he had treated him very badly—had no right to send the goods to auction.   Col-

bert said he had a right to do what he pleased with his goods, and would give him $500 down in gold, and his note for balance at six months. He told Caldwell he had no right to injure his credit, and that he was doing him great injury. Caldwell said he would consult his partner. Plaintiff assured him he should get his pay, and hoped he would spread no report to his prejudice. Caldwell said he had never mentioned it out of his own store, and never should.

Plaintiff was doing a business of $—— a year before that—when I left he could not pay my salary. It was some time after the protest, I couldn't buy goods on credit; think it was over a week after the goods were bought of Caldwell before they were sent to pawnbroker's.

Whereupon Mr. Justice WOODWARD ordered a nonsuit, according to the act of assembly in such case made and provided.

To this order the plaintiff excepted, and assigned the same for error.

*Benjamin H. Brewster, Theodore Cuyler,* and *William L. Hirst,* for plaintiff below and in error,

Contended that the testimony showed the uttering by the defendant of words concerning the plaintiff which, first, were actionable *per se;* and 2d, were spoken of him in his trade or business, wherein good credit was essential and vital, and were attended with special damage.

It is submitted that a plaintiff sustains a case of slander if he proves that the defendant uttered words importing that he committed an infamous offence, although no such offence, in fact, was committed by any one, and even if it was impossible to commit the offence at all.

In *Eckart* v. *Wilson,* 10 S. & R. 45, the words were, " You killed A. B. ;" these were held actionable, *although A. B. was living.* Duncan, J., p. 47, says : " Did the words convey the imputation of crime ? Could they, standing alone, as they did, convey to the hearers any other meaning than a charge of murder ?"

So in *Bricker* v. *Potts,* 2 Jones, 200, where the words imported a charge of perjury in a judicial proceeding, *although no such proceeding ever existed.*

So, also, *Deford* v. *Miller,* 3 P. R. 103 ; Starkie on Slander, 44 ; *Hays* v. *Brierly,* 4 W. 392 ; *Oldham* v. *Peake,* Bl. Rep. 961 ; *Dexter* v. *Faber,* 12 Johns. 260 ; *Goodrich* v. *Wolcott,* 3 Cow. 231 ; *Dottarer* v. *Bushey,* 4 Har. 208.

2d. Words spoken of another, in his trade or business, whether attended with special damage or not, are actionable.

Starkie on Slander, 116 to 121; *McMillan v. Birch*, 1 Binn. 184; *McClurg* v. *Ross*, 5 Binn. 221; *Phillips* v. *Haffer*, 1 Barr, 63; *Dobson* v. *Thomiston*, 3 Mod. 112.

In the late English case of *Evans* v. *Harries*, decided in June, 1856, 38 Eng. L. & E. Rep. 347, words importing fraudulent conduct in an innkeeper in the way of his trade or business, whereby his guests and customers abstained from visiting his inn; it was ruled (on evidence that he had lost business, since the words were spoken) that he could recover, and that the jury could assess damages for a general loss or decrease of trade, although the declaration alleged the loss of particular customers as special damage, which was not proved.

*J. Fallon*, for defendant in error.

The opinion of the court was delivered March 8, 1858, by

THOMPSON, J.—It is undoubtedly settled that to charge a person with the commission of an infamous offence, the *corpus* of which never existed, is, notwithstanding, actionable, "for the risk of a prosecution which it induces shall be compensated in damages." Per C. J. GIBSON, in *Deford* v. *Miller*, 3 P. R. 103. And when an indictable or infamous offence is unequivocally imputed in the words used, for instance, to say of one that he is a *thief*, or has committed *perjury*, the terms imputing the offence being *generic* and expressive of every ingredient to constitute it, are *per se*, and without any reference to extrinsic matters, actionable. But when they are qualified or explained at the time of speaking so as to negative an indictable charge, which a court may perceive, and in view of which the judge would be bound to charge the jury that the words were not actionable, he may properly at *Nisi Prius* award a non-suit under the act of assembly.

Had the charge in this case been that the plaintiff "had obtained the goods" from the defendant "by false pretences," it would doubtless have been held actionable. It would have been a clear imputation of an indictable and infamous offence, one involving fraud, deceit, concealment, and misrepresentation successfully practised. But the defendant did not stop at a point which any one would understand from the words that this was his meaning, for he negatived the turpitude and indicated the qualities by saying in the same sentence that the plaintiff had got the goods for the purpose of making bags, and that he (the defendant) afterwards found them in an auction store." This was simply a charge of dealing with the goods in a different manner from what the plaintiff had represented he was going to do, and there was not a word of evidence or

[Robeson *v.* Schuylkill Navigation Company.]

any room to show that the defendant charged the plaintiff with procuring the credit upon a promise to make bags, and that such pretence induced the defendant to part with the goods. That taking them to auction when bought on credit is a reprehensible and injurious practice is proved, and that this was the import of the charge is evident. There was no double sense discoverable in them, and none alleged as existing, so as to require the action of a jury. If the plaintiff had been put upon his trial for obtaining goods under false pretences, and the proof had been just what the defendant charged, no one could for a moment have imagined that he could legally have been convicted on such evidence. This case differs from the class of cases in which a groundless charge is made, but in terms clearly imputing an infamous offence. In such cases the defendant will not be permitted to escape upon the poor excuse that the charge is so utterly a fabrication that by no possibility could the party be injured, no such offence having been committed. *Eckart* v. *Wilson*, 10 S. & R. 45. For, as clearly shown, the party is entitled to be compensated for the risk he runs of being prosecuted. The words in this case did not subject the party to such risk. They were not actionable, and could not be made so by innuendoes.

The evidence to prove special damages arising out of words spoken by defendant was a failure. It was shown that the plaintiff lost credit from the fact that he had taken goods to auction-houses for sale to raise money, but not one of the witnesses gave the name of the defendant as his informant. Indeed, the fact was clearly shown to have existed, and this it was, as the witnesses testified, that occasioned the withdrawal of credit, and, of course, the special damages, if there were any.

Nor was the case any better for the plaintiff on his last point, that certain words laid in the *narr.* were actionable because spoken of the plaintiff in regard to his business. The defect of the case in this particular was the entire absence of evidence that any such were spoken. We think the judge was right in awarding the non-suit.

Judgment affirmed.